

Reinhart Boerner Van Deuren s.c.
P.O. Box 2965
Milwaukee, WI 53201-2965

1000 North Water Street
Suite 1700
Milwaukee, WI 53202

Telephone: 414-298-1000
Facsimile: 414-298-8097
reinhartlaw.com

October 29, 2014

Michael G. Goller
Direct Dial: 414-298-8336
mgoller@reinhartlaw.com

Honorable William M. Conley
U.S. District Court
Western District of Wisconsin
120 North Henry Street
Madison, WI 53703

Dear Judge Conley:  Re:  Sentencing in *United States v. Jared Jerome Hart* - No. 3:14-CR-00027-wmc

As counsel for Mr. Hart in the above-entitled matter, I provide the following for your consideration in imposing sentence on November 4, 2014.

## INTRODUCTION

Jared Hart ("Jed") purchased the Pickle bar through his corporate entity, J&L Corporation in 2008. He kept very poor records and treated the funds of this business as his own (*i.e.,* he comingled corporate and personal funds).

More to the point, however, he kept (*i.e.,* skimmed) cash from his business. While some of this cash was used for business purposes, much of it went for personal use. These amounts were not reported to his accountant. Thus, Jed's tax returns were incorrect and Jed underpaid his tax obligations for years 2008 through 2011.

Below I discuss Jed's basis for requesting that this court impose a sentence below the applicable guideline range. Specifically, a sentence with a home detention with electronic monitoring component is an appropriate sentence in this case.

## FACTORS TO BE CONSIDERED IN IMPOSING SENTENCE

The factors this Court should consider in imposing a sentence are set forth in 18 U.S.C. § 3553:

> (a) Factors To Be Considered in Imposing a Sentence.—The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider—

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> >
> > (B) to afford adequate deterrence to criminal conduct;
> >
> > (C) to protect the public from further crimes of the defendant; and
> >
> > (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;[1]

18 U.S.C. § 3553(a).

## THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

The nature and circumstances of the offense were set forth at the plea hearing. In short, this is a routine tax case. There is nothing sophisticated about Jed's conduct.

Simply put, Jed took funds from his business (i.e., the Pickle bar) and spent these funds as he saw fit. Some of the expenditures were business expenses (*e.g.,* trips to Walmart to buy supplies, a large screen TV given away to a customer or five dollar bills given to potential customers on the street). Other expenses were clearly personal in nature (*e.g.,* Jed paid his home mortgage with money from his business). Jed offers no excuse for his conduct. It was wrong.

The undersigned, however, does note that Jed was young (age 30 in 2008). His formal education stopped after high school. When the Pickle bar started to make money in 2008, this was the first time in Jed's life where he had easy access to large amounts of cash. Due to an error in judgment, Jed spent much of this cash and did not keep track of where the cash went. When the time came to report his revenue and expenses to his CPA, he provided the CPA with revenue and expense information which he knew to be incorrect.

Jed did not initially plan to underreport his income. In 2009, when he summarized his 2008 revenue and expenses for his accountant it seemed very simple to estimate a low number. Once the first year's tax return was filed (2008), the following years (2009 to 2011) simply followed.

---

[1] This factor is not relevant in Jed's case and is not addressed in this letter.

This case differs greatly from the tax case where a wealthy individual sets up a scheme within his or her business to skim even more money so as to support a lavish lifestyle. To the contrary, the reason for the criminal activity in this case is Jed's youth and lack of good judgment. This conduct can be explained (but not excused) by his youth, inexperience and the emotional burdens in Jed's life.

Jed has learned from his mistakes. He vows that nothing like this will ever happen again.

## THE HISTORY AND CHARACTERISTICS OF JED HART

Jed was born on June 17, 1978, in Eau Claire, Wisconsin. He has one older sister. Jed's mother worked very hard to support the family. Jed barely knew his biological father, Gary Reichert, and Gary was never a part of Jed's life.

Jed attended public schools in Eau Claire, Wisconsin. He graduated from Eau Claire Memorial High School. In 2000, he moved to Madison to start another branch of his mother's title company, All Title Services, Inc.

Jed's mother's brother, John Patrick Hart, helped raise the family. John taught Jed how to fish and hunt. John and Jed hunted together often in northern Wisconsin. Growing up, John was Jed's only father figure.

In 2001, John Hart was living in San Francisco with his wife and his two young children. On September 9, 2001, John and Jed spoke for a couple hours, catching up and discussing the upcoming hunting season. This was the last time the two spoke.

John was employed by Franklin Templeton Funds in the San Francisco office. He was scheduled to teach a seminar in New York. The seminar was ultimately scheduled for September 10 and 11, 2001. John was teaching in the South Tower of the World Trade Center on September 11, 2011 and was a victim of the terrorist attack that occurred on that date.

Specifically, on the morning of September 11, 2001 Jed woke up to phone call from his mother. She told him to turn on his television. She quickly reassured Jed that John was in the other tower; however, sixteen minutes later, a second plane hit the second tower.

After the first tower was attacked John made it to the exchange elevator on the 72nd floor but went back to lead his class out of the building. The second plane came in underneath where John was in the building. John was able to phone his wife and tell her that he was in "big trouble." At that time, the power lines burned, and the phone went dead.

Immediately after September 11, Jed, his sister, his aunt (John's sister), and two of John's friends drove to Manhattan. They spent two weeks searching for John. Unfortunately, John perished in the attack.

The United States government continues to perform DNA testing on victim's remains and returns to families cremated body parts. In 2007, the government returned John's knuckle and clavicle, which John's wife and children gave to Jed.

John's death had a profound impact on Jed. Jed moved from Madison to Eau Claire. Jed's mother continues to suffer from the trauma of losing her brother in such a horrific manner. To this day, when Jed's mother sees an eagle or someone brings up September 11, she begins to cry. Jed plays a very important role in helping his mother cope. He also supports the law enforcement community including holding fundraisers for the police, fire department, and the military.

Jed's grandmother (John's mother) also suffered after John's death. Jed had a close relationship with his grandmother until approximately five years ago when she passed away from an aneurism.

In addition to the trauma of losing his father-figure and helping his mother cope with the loss of her brother, in November, 2001, Jed's mother was diagnosed with stage 4 uterine cancer. She underwent surgery in December of 2001. Several years after surviving uterine cancer, she was diagnosed with breast cancer. Her cancer is being watched by her physician.

In July 5, 2008, Jed married Elizabeth ("Beth"). Jed and Beth have been happily married for 6 years. Jed and Beth struggled to have a child. Beth underwent four years of infertility, and the couple endured one miscarriage. In 2013, days before they were scheduled to begin invitro fertilization (IVF), the Harts discovered that Beth was pregnant. Jed and Beth are now the parents of Leo John, who is nine months old (born January 29, 2014).

Jed works between forty to sixty hours per week at two jobs. He works at his mother's title company and also at the Pickle bar.

Since approximately 1995, Jed has worked for his mother's title company. He currently works on loan closings throughout state of Wisconsin. He is considered the "travel-closer," and he travels to closings throughout the state. The title company primarily deals with residential titles, but also does some commercial closings. Jed also inspects properties and searches chains of title at courthouses and registers of deeds offices throughout the state. In addition to these roles, he is involved in the marketing of the business. He played a crucial role in marketing the business to attract and maintain customers after the recession. The company currently employs approximately 19 people.

Jed owns the Pickle bar through an S-corporation, J&L Corporation, Inc. Historically, Jed as done most of the work at the bar, including DJ'ing, bartending, cleaning, serving as a bouncer, and running the business. He currently employs thirteen people at the Pickle bar.

Jed suffers residual effects from a head trauma that occurred when he was twenty-one years old which includes headaches and increased risk of seizures. The incident left him

unconscious for three days and with two hemorrhages in the front of his brain. Jed also has an enlarged left side of his heart which doctors recommend that he continues to monitor. In the past few years, Jed lost about 120 pounds by making changes to his lifestyle, including quitting drinking and smoking.

Jed is the primary means of financial support for his family. Beth teaches in the Eau Claire School District. She has earned the school's distinction as a Gifted and Talented Teacher. She works four days a week, rotating between the top three low-income schools in the district, helping gifted and talented students that range from kindergarten to fifth grade. She has been a teacher for five years, and this is her second year as the "Gifted and Talented Teacher."

Jed also provides emotional and day-to-day support for his immediately family as well as his extended family. Jed is a hands-on father. Jed's mother relies on Jed's assistance with regard to both emotional support and performing day-to-day chores at her house.

Since the execution of the search warrants in this case (something that served as a "wake up call" to Jed), Jed has turned his life around. He has lost over 120 pounds and has started to regularly exercise. He and his wife have become active members of Peace Lutheran Church (see attached letter from Jed's pastor). Jed has taken steps to ensure that his business' revenue and expense are accounted for correctly. The primary focus of his life is his faith, his wife and their new baby, Leo John. While facing a federal criminal prosecution is not an experience that anyone would want to face, Jed has learned from this experience and, in many respects, made the most of it.

Attached are numerous support letters written by Jed's family, friends and business colleagues (Exhibit A). A common theme that runs through these letters is how Jed has faced adversity throughout his life and, but for the actions that give rise to his tax case, Jed has handled these challenges with dignity and grace.

Jed's wife, Elizabeth, notes that Jed grew up with an absentee father; he was deeply impacted by the death of his uncle/father figure on September 11, and, has found a way to be a good and loving husband and father.

Jed's mothers, Christine L. Hart Reichert, notes in her support letter how Jed has helped her through her two cancer diagnoses.

## SENTENCE TO REFLECT THE SERIOUSNESS OF THE OFFENSE, TO PROMOTE RESPECT FOR THE LAW AND TO PROVIDE JUST PUNISHMENT FOR THE OFFENSE

As discussed below, the Probation Department and the undersigned disagree on the tax loss calculation. Regardless, Jed requests that the court impose a below guidelines sentence. The purposes of sentencing - punishment, restitution, deterrence and protection of the public - will all be served by a below guideline sentence.

Jed and Beth are new parents. Any period of confinement will have a significant negative impact on the Hart family. Further, Jed has already incurred significant legal bills, embarrassment, and damage to his business and reputation. These events have combined to provide ample punishment.

Further, Jed has already paid to the IRS a substantial amount toward restitution in this case ($97,367.40). Jed plans to make peace with the IRS in the near future. Indeed, the undersigned has already been in contact with the civil IRS Revenue Agent who has been assigned to the case and hopes to resolve the case in the near future.

Jed concedes that his personal problems and sloppy bookkeeping are in no way an excuse for his conduct. These challenges do help to explain how an otherwise law abiding individual, who since graduating high school has spent most of his life trying to help his family, would cheat on his taxes.

## ADEQUATE DETERRENT AND PROTECTION OF THE PUBLIC FROM FURTHER CRIMES

There is virtually no chance that Mr. Hart will ever underreport his tax liability again. He has taken steps to make sure that the business is run appropriately; all revenue and expenses are correctly accounted for and all income is reported to the IRS. He has learned from this experience.

Further, due to Jed's status as a higher profile bar owner in Eau Claire, Wisconsin, the publicity surrounding this case has already had a negative effect on Jed's reputation. However, the public nature of this case has also sent a strong deterrent message to the public.

## A DEPARTURE FROM THE GUIDELINES CALCULATION IS APPROPRIATE

Although the Sentencing Guidelines are advisory and have persuasive value in determining a reasonable sentence under Section 3553, they have no binding effect on this Court's decision. *See United States v. Ranum*, 353 F. Supp. 2d 984, 985–86 (E.D. Wis. 2005). Nevertheless, courts are still required to properly calculate the Guidelines and consider them when imposing a sentence. *Id.*; *see also United States v. Dean*, 414 F.3d 725, 728–31 (7th Cir. 2005).

As set forth in the Addendum to the PSI report (Doc. No. 19) and the Revised PSI report (Doc. No. 20), there are unresolved objections to the calculation of Jed's base offense level. Specifically, the parties disagree on the level of the tax loss. The Probation Department concludes that the tax loss is more than $400,000 but less than $1,000,000. The Probation Department calculates a federal and state tax loss of $488,292.80. (Revised PSI ¶ 42)[2] Jed

---

[2] The Probation Department's calculation, the IRS criminal calculation and the recent IRS civil calculation all differ slightly. The Probation Department calculates federal tax due of $427,014. The IRS criminal calculation shows federal tax due of $423,670. The IRS civil calculation shows federal tax due of $422,493.

contends that the tax loss should fall between $200,000 and $400,000. The basis for this calculation is set forth in greater detail in Mr. Hart's objections to the PSI (Doc. No. 18).

The government's sole support for its calculation of unreported income is the entries in Jed's At-A-Glance Calendars. Jed, however, has explained that those entries do not represent total sales, but rather the sum of both sales and complimentary product giveaways.

Further, Jed notes that one need not accept his word on this issue. The IRS has prepared its own Bank Deposit and Cash Expenditure calculation which supports a much lower tax loss number (See Doc. No. 18, Exhibit B). Additionally, a Cost of Goods Sold or Gross Markup calculation prepared by the undersigned (See Doc. No. 18 at 5-7) also supports a significantly lower tax loss number.

Additionally, attached is a letter from Paul Kohler, President of Charter Bank (Exhibit B). Charter Bank is a lender to the Pickle bar and most other bars in the area. Mr. Kohler notes that his bank relies on the survey prepared by the Risk Management Association to determine a borrower's expected revenue, expense and profit. This survey indicates that a bar such as the Pickle bar would have a Gross Profit Percentage of 57.1%, meaning that the Gross Profit percentage calculated by the IRS (69.7%) is well above what Mr. Kohler would expect a bar, such as the Pickle, to generate.

The Pickle bar is a college bar which serves college students (*i.e.,* a group of customers who are very price sensitive). It would be near impossible for such a bar to generate the profit calculated in the PSI. Certainly, the government has not established by a preponderance of the evidence that this bar earned a near 70% gross profit percentage.

Finally, Jed has provided the Probation Department with his estimate of cash expenditures that were not deducted as business expenses (See Doc. No. 18, Exhibit C). These expenses alone would reduce the tax loss below $400,000. The Addendum to the PSI, however, ignores these items because there are no records to support their existence (Doc. No. 19 at 2). However, if the test for allowing a deduction for cash purchases was well kept records, then most small businesses would be denied many legitimate deductions.

A much more reasonable method of addressing unsubstantiated expenses is the Tax Court's so called Cohan Rule. Specifically, where taxpayers do not have adequate records, but where the facts suggest that they incurred an offset of gross income (*e.g.*, cost of goods sold) a court may estimate the offset. See *Bobry et. al v. Comm'r,* T.C. Memo 1997-27 (Jan. 15, 1997), citing *Cohan v. Comm'r* 39 F2d. 540, 544 (2nd Cir. 1930)

In *Bobry et. al*, the taxpayer purchased scrap metal by making checks out to cash, cashing the checks and purchasing the metal with cash. The IRS argued, much like the Probation Department in our case, that because the taxpayer did not have records to support the purchases of scrap metal, no deduction should be allowed. However, the Tax Court allowed the taxpayer to deduct the cash purchases, based on the fact that if the IRS' numbers were correct, the Gross Profit Percentage reported by the taxpayer would far exceed the industry average. As such, the

Tax Court, pursuant to the Cohan Rule estimated the cash purchases of the taxpayer and allowed a deduction for those purchases.

The same is true in our case. There is no doubt that Jed kept cash from the business. There is also no doubt that he went to Walmart and other stores and purchased personal items and business items. He would either pay for his entire purchase in cash or use a credit card which he later paid for with a cashier's check. When making his purchases, he did not segregate personal from business purchases. He, like most shoppers, put items in a shopping cart, went to the cashier and paid for them. Thus, business expenses were paid for with cash and not reported to Jed's CPA.

Jed has made a good faith estimate of these business expenses. Indeed, the undersigned instructed him to estimate low not high (*i.e.,* make a conservative estimate of cash expenditures which were not deducted). As such, Jed's estimate of nondeducted cash expenses should be considered when determining the tax loss.

Accordingly, should the court impose a below guideline sentence, the issue of the tax loss becomes almost moot. However, should the court use Jed's base offense level as a basis for determining the appropriate sentence, the tax loss is very relevant.

The Revised PSI indicates a tax loss that is just barely into a new guideline range (*i.e.,* a tax loss of $488,292 in a range of $400,000 to $1,000,000). If the Revised PSI's tax loss was in the middle or upper end of this range, Jed might not challenge the calculation. However, given the fact that it seems nearly impossible that this calculation is correct and the cutoff for a lower guideline range is so very close, Jed has objected to the tax loss calculated in the Revised PSI.

## CONCLUSION

Regardless of whether this court determines that the tax loss in this case is over or under $400,000, Jed asks that the court consider a sentence below the applicable guideline range. A sentence of home detention with an electronic monitoring component would be consistent with the factors set forth in 18 U.S.C. § 3553.

Yours very truly,

*-s-Michael G. Goller*

Michael G. Goller

21500019

Encs.